UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
                              )
UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
      v.                      )    CR No. 09-029 S
                              )
JOSE PEREZ,                   )
                              )
            Defendant.        )
                              )
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Defendant Jose Perez ("Perez") moves to suppress all statements and evidence seized from Perez' home on Chalkstone Avenue in Providence, Rhode Island by the Providence Police Department ("PPD") and the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF"). Perez argues that law enforcement officers, who were surveilling his apartment on the basis of a tip from a confidential informant, stopped the car in which he was riding as a passenger with neither probable cause nor reasonable suspicion. Perez was handcuffed, placed in the back of a police vehicle, and transported approximately two miles to his Chalkstone apartment. The government contends Perez voluntarily consented to a search of his home and he told officers that cocaine was hidden in the Playstation console. Defendant argues that the consent obtained by

the officers was involuntary and the result of a coercive environment.

For the reasons set forth herein, the Defendant's motion is DENIED.

I.   Findings of Fact

Perez became the target of a joint effort between the ATF and the PPD after a confidential informant ("CI") advised ATF Agent Christian Jardin that a significant amount of crack cocaine was being offered for sale by Perez at 1168 Chalkstone Avenue ("the apartment") in Providence, Rhode Island.[1]  Evidence adduced at the suppression hearing indicated that the CI was involved in prior investigations with the ATF.  Officer (now Detective) Christopher Currier testified that information obtained from the CI, on at least two other occasions, led to arrests and the successful seizure of firearms and narcotics.

This time, as a result of the CI's cooperation, law enforcement officers were able to successfully conduct a controlled buy of crack cocaine from Defendant.  The controlled buy entailed the officers giving government funds to the CI in order to effectuate the purchase of drugs.  The CI was searched immediately

---

[1] This is a multi-unit house.  Perez' apartment is on the first floor.

before the buy, and monitored while entering Defendant's apartment; however, the monitoring did not extend to inside the apartment and officers testified that they did not witness Perez selling cocaine. The CI returned with a significant amount of crack cocaine, confirming that he purchased it from Perez.

On March 9, 2009, within a few days of the controlled buy, law enforcement officers began surveillance of the apartment. Officers observed two men arrive at the apartment in a blue Audi. The two men entered the apartment and after approximately twenty minutes, they left with one person carrying a white shopping bag. The men returned to the blue Audi and began to drive away from the house.

Detective Currier testified that he and Agent Jardin were in direct communication with the officers conducting surveillance on the apartment. At this time, the officers at the scene informed Currier and Jardin that the two men were leaving the apartment with a white bag. At the hearing, the officers testified that they did not check the license plate of the car or otherwise attempt to identify the men. Currier testified that after discussing the possibility that the cocaine was being transported away from the house, they determined that it was necessary to stop the men immediately, in lieu of continuing a longer term investigation. Accordingly, law enforcement officers followed the vehicle for

3

several miles and stopped the car on the corner of Broadway and Pallas Street in Providence.

Officer Shawn Moffett and Special Agent Eric Yankee approached the vehicle.   Officer Moffett testified that he smelled burning marijuana and a marijuana cigarette was seen in the ashtray located between the driver's and front-passenger's seats.  Officer Moffett also testified that the white shopping bag, which was partially open on the floor of the front passenger side, contained nothing but potato chips.

The occupants of the vehicle were then removed, handcuffed, and placed in separate police cars.  It appears that the Defendant was identified at this point as the resident of the Chalkstone apartment.   The marijuana was seized and the situation was communicated to the other officers and agents involved.  Sergeant Fabio Zuena was dispatched to the apartment to continue surveillance as the narcotics had not been transported away, as initially believed.   Officer Moffett was instructed to transport Perez back to the apartment.

Perez was handcuffed from behind and placed in the back of Officer Moffett's unmarked car.  Although Perez was not formally arrested for either the marijuana cigarette or the suspected

cocaine possession; he was Mirandized by Officer Moffett.  Officer

Moffett testified that Perez was not free to leave the scene.

After Perez was transported back to the Chalkstone apartment,

Sergeant Zuena informed Perez that he was under investigation for

narcotics violations, read Perez his <u>Miranda</u> rights, and had Perez

sign and initial a waiver of rights form.  Sergeant Zuena testified

that he asked to search Defendant's apartment while they were

outside.  Defendant consented to the search and provided Sergeant

Zuena with the keys to his home.  Sergeant Zuena testified that

although Defendant was presented with a consent to search form to

sign while outside the apartment, Perez wanted to go inside to sign

the form.  Officer Moffett also testified that he believed

Defendant wanted to go inside.

After Perez produced his house keys, an officer opened the

door, and Perez entered the apartment first, still handcuffed,

followed by several officers.  The officers "cleared the house,"

making a sweep to determine whether anyone else was present.  The

officers testified that Perez signed the consent to search form[2]

and informed the officers that drugs were hidden in the Playstation

console.  As a result of Defendant's advice, officers uncovered "a

---

[2] Defendant argues that the fact Perez' signature on the
consent form appears dissimilar to the signatures on the other
forms he purportedly signed contemporaneously suggests the consent
was invalid.  Sergeant Zuena testified that although he filled out
the textual information, Perez signed and initialed the consent to
search form.  The Court accepts the testimony of Sergeant Zuena and
finds that Perez signed the consent to search form.

significant amount of crack cocaine along with a digital scale and plastic bags." (Hr'g Tr. 15:24.)

Perez was arrested and taken to the police station. At the station, the officers Mirandized him once again and had him sign and initial another waiver of rights form. Both interviews taken at the station with Defendant were tape-recorded. The audio of the two interviews was played and the transcript, for limited purposes, was admitted without objection at the suppression hearing. The following conversation transpired:

> DET. CURRIER: I know we read you your rights at the house. I am just going to do this again, okay, for your benefit. [Reads Miranda warnings] Do you understand?
>
> DEFENDANT: Yeah.
>
> DET. CURRIER: All right. And just like the other one, I just need you to read it as in read it and initial on each one. Check off yes that you understand, if you do, the date and your signature.
>
> DEFENDANT: If I don't want to answer any questions, I don't have to?
>
> DET. CURRIER: That's correct.
>
> OFFICER 2: Well basically you can stop anytime you want to.
>
> DEFENDANT: All right. But if I do - if I have to, if I have to get a lawyer, I don't know any lawyers. So I have to - I can make a phone call and have somebody call one.
>
> DET. CURRIER: Yup.

OFFICER 2:          And now if, if - if you can't afford one,
                    usually the court would, uh, will appoint
                    one for you.

DEFENDANT:          Which is a public defender?

DET. CURRIER:       Correct.

During the recorded conversation, Defendant acknowledged that this was not the first time his <u>Miranda</u> rights were read to him. He also asked several intelligent questions, sounded calm, and demonstrated full understanding of his precarious situation. On the audio he continued to make incriminating statements with respect to the crack cocaine that he told officers was hidden in the Playstation. Perez admitted that the drugs were his alone, that he had purchased them on that day, that there were approximately 170 grams of cocaine, and that he paid about two thousand dollars for the narcotics.

Defendant argues that suppression is required because (1) there was neither probable cause nor reasonable suspicion to support the initial stop of the car; and (2) the consent to search his apartment was involuntary.

II.  Discussion

    A.   The Stop

The first question is whether the initial interference of stopping the vehicle was justified. The Court has said that it is "beyond cavil that <u>Terry</u> allows an officer, 'in appropriate circumstances and in an appropriate manner [to] approach a person

for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" United States v. Sandoval-Espana, 459 F. Supp. 2d 121, 131 (D.R.I. 2006) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).  When testing the lawfulness of an investigatory stop we evaluate "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Am, 564 F.3d 25, 29 (1st Cir. 2009) (quoting United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998) (quoting Terry, 392 U.S. at 20)).

Defendant argues that the government cannot meet its burden because Perez' identity was not verified before the stop took place and there was no traffic violation.  However, the  facts known to the officers at the time of the stop, and articulated at the hearing, support that it was reasonable for the officers to suspect that narcotics were being transported.  The officers relied upon their collective knowledge that a significant amount of cocaine was being offered for sale by Perez at the apartment, which was provided by a reliable informant that had worked with them in the past.  Importantly, the information was corroborated through a controlled drug buy that was orchestrated closely in time with the events at issue.  The officers also relied upon additional facts

that evolved during the surveillance of the apartment. The exigency behind the stop developed after officers observed two men enter the apartment empty-handed and leave with a white shopping bag, arguably removing drugs from the apartment. With this factual backdrop, the officers were permitted to conduct an investigatory stop of the vehicle in order to allay these suspicions.

   B.   De Facto Arrest

   "Even where a stop is valid, an officer's 'subsequent actions must be responsive to the emerging tableau-the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed.'" United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) (quoting United States v. Taylor, 511 F.3d 87, 90 (1st Cir. 2007)). Once the vehicle was stopped, the marijuana found, Perez identified, and the officers' suspicions regarding the cocaine transportation established as groundless, the officers chose not to formally arrest Perez. Instead, he was handcuffed, placed in the back of a patrol car, read his Miranda rights, and transported approximately two miles to his apartment where several officers were waiting for him.

   While an "investigatory stop may morph into a de facto arrest," "there are no scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests, [therefore] the standard mode of inquiry is to assess the totality of the circumstances and ask whether a reasonable person in the

suspect's shoes would understand [him]self to be subject to restraints comparable to those associated with an arrest." Morelli v. Webster, 552 F.3d 12, 19-20 (1st Cir. 2009). The "ultimate inquiry" is whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). Again, there is no per se rule and "[h]allmark factors such as physical restraint or a show of force may be suggestive, but in certain circumstances such factors may be perfectly consistent with an investigatory stop." Morelli, 552 F.3d at 20.

The facts support that Perez had been completely deprived of any freedom of movement during his detention, which lasted approximately twenty minutes while he was transported two miles back to his apartment. Although he was not formally arrested for the marijuana or cocaine sale, he was handcuffed, held in a police car, informed of his Miranda rights, told he was the subject of an ongoing investigation, and forcibly transported to another location. The officer that detained and transported Perez readily admitted that Perez was not free to leave the scene. Under the totality of circumstances, a reasonable person in Defendant's shoes would understand this to be the equivalent to an arrest.

10

When dealing with a de facto arrest, reasonable suspicion is no longer enough and probable cause must exist. Probable cause is an objective standard that focuses on the likelihood of criminal activity. Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004). "Probable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was sufficient to warrant a prudent person in believing that the defendant has committed or was committing an offense." United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001) (citation and quotation omitted). After the Terry stop, when it was established that there was no cocaine in the white shopping bag, the officers were still acting with the knowledge of the controlled drug buy and the information given by the CI.

When law enforcement uses information from a CI to provide probable cause, a "totality of the circumstances" test is used to ascertain whether the information established probable cause. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). Factors to be considered are the CI's veracity, reliability, and the basis of his or her knowledge, and also whether some or all of the CI's statements were corroborated. United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997). Law enforcement need not eliminate the risk that the CI is lying; rather, law enforcement must reduce

the probability of a lying or inaccurate CI. _Id._ Verifying that part of the CI's story is true may assist in reducing the probability that the CI's information is inaccurate; however, verification of easily known or non-incriminating facts does not demonstrate that the CI has a legitimate basis for knowledge of defendant's alleged criminal activity. _Id._ The details of the CI's information, combined with other circumstances, must "generate suspicion . . . that contraband or evidence exists on the premises." _Id._

The Court concludes with little difficulty that the collective knowledge of the officers at the time of the _Terry_ stop was sufficient to justify Defendant's _de facto_ arrest and detention. After discovering that cocaine was not being transported in the white bag, the officers were faced with a new situation where an intended long-term investigation was suddenly cut short because Perez was aware that he was the subject of an ongoing investigation. The information given by the CI, who had successfully worked with the ATF in the past, combined with the information obtained from the controlled buy, furnished probable cause to believe that Perez was trafficking in narcotics. The risk of a lying or inaccurate CI was significantly reduced by the fact that the CI had furnished reliable information in the past on at

12

least two occasions.  Furthermore, the officers reduced the risk of an inaccurate CI by obtaining corroboration through an orchestrated drug buy.  The stop itself occurred within a relatively short time period from the controlled buy.  The Court concludes that under the totality of circumstances, the officers had enough information that a prudent person would believe a crime had been committed by Perez. Accordingly,  the  actions  of  the  officers  in  detaining  and transporting Perez back to the Chalkstone apartment was lawful.

    C.   Consent to Search the Chalkstone Apartment

    Defendant argues that under the totality of circumstances the consent he gave to search his apartment was vitiated by a coercive environment.  "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search."  Dunbar, 553 F.3d at 56-57 (quoting United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006) (quoting United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978))).  Voluntariness is assessed by considering the totality of a number of circumstances:

> The court should take into account factors such as the consenting party's "age, education, experience, intelligence, and knowledge of the right to withhold consent."

Id. at 57 (quoting United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)).  Further considerations "include whether the consenting party was advised of his or her constitutional rights and whether

permission to search was obtained by coercive means or under inherently coercive circumstances." Id.

Defendant does not dispute that he was properly Mirandized or that he voluntarily signed the forms waiving those rights. The defendant does not argue that he did not understand his rights or that there was anything in his personal background (age, intelligence, experience, education, etc.) that could have rendered the warnings given to him ineffectual. The only issue is whether the environment was so coercive that the consent to search was involuntary.

In support of his theory, Defendant argues that he was transported in the back of a police cruiser, handcuffed, and at the time he gave the consent to search his home, he was surrounded by officers that had already entered the premises. However, it is apparent that the amount of time that he was detained, and specifically, the time between the initial stop and his consent, was minimal. In fact, Perez orally consented to a search of his home after the officers had repeatedly advised him of his Miranda rights, which this Court finds he understood and knowingly waived. Defendant, of his own free will, produced the keys to his home and gave them to the officers, approving of their entry. Perez then read, initialed and signed a consent to search form. Although the officers did a general sweep of the premises to ensure their safety, the Court concludes that the search of Perez' home occurred

14

after consent was properly obtained.   In addition, Perez proceeded to tell the officers exactly where the cocaine was located.   The Court finds that the substantial number of officers at the apartment and the fact that the defendant was handcuffed and transported in the police cruiser to his apartment are not enough to render Perez' consent to search involuntary.

III. Conclusion

For the foregoing reasons, the Court denies the Defendant's Motion to Suppress.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
United States District Judge
Date: 10/19/09

15